**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: (212) 465-1188
Fax: (212) 465-1181
*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ASHLEI MCBRIDE,
*on behalf of herself and all others similarly
situated*,

Plaintiff,

-against-

VOGUE INTERNATIONAL LLC,

Defendant.

---

Case No.:

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff ASHLEI MCBRIDE ("Plaintiff"), individually and on behalf of all others similarly situated in New York and the United States, by her undersigned attorneys, pursuant to this Class Action Complaint against VOGUE INTERNATIONAL LLC ("Defendant"), alleges the following:

<u>**NATURE OF THE ACTION**</u>

1.     This is a consumer protection class action arising out of Defendant's deceptive practices in the marketing, advertising, and promotion of its Proganix "Repair" line of shampoo, conditioner, and hair oil products. These include:

a.  Proganix Vitamin E + Ceramide 3 Repair Shampoo Healing + Anti-Breakage

b.  Proganix Vitamin E + Ceramide 3 Repair Conditioner Healing +Anti-Breakage

c.  Proganix Vitamin E + Ceramide 3 Repair Reparative Oil + Anti-Breakage

d.  Any other Proganix hair care product with "Repair" claims on the label (collectively, the "Products").

2.  Through an extensive, widespread, comprehensive, and uniform nationwide marketing campaign, Defendant represents to consumers that the Products are capable of "repair"—that is, that it is capable of repairing damaged hair—when this claim is in fact false and deceptive.

3.  Below are images of the Products:



Below is a reproduction of the Proganix Vitamin E + Ceramide 3 Repair Reparative Oil + Anti-Breakage product back label:



Moreover, the Products' reparative claims can be seen directly on the Products' label, as shown below:



(Image taken from Proganix Vitamin E + Ceramide 3 Reparative Oil + Anti-Breakage)

3

4.      The Products do not actually repair damaged hair, however, since there are no ingredients in the Products that could do so.  Hair is primarily composed of a family of proteins called keratin. Hair cannot be repaired once damaged through heat treatments, daily brushing, and other quotidian acts because keratin is inorganic, "dead" matter.  While the Products might create the temporary illusion that the consumer's hair has been repaired, this is indeed an illusion because nothing in the Products can mend damaged keratin proteins.

5.      As a result of Defendant's misconduct, Defendant was able to sell the Products to thousands of consumers throughout the United States and New York and make enormous profits it would not otherwise have earned.

5.      Plaintiff MCBRIDE was among the victims of Defendant's deceptive conduct and brings this action on behalf of herself and all other similarly situated consumers who, from the applicable limitations period up to and including the present (the "Class Period"), purchased the Product in New York and nationwide ("the Class").  Plaintiff seeks to end Defendant's dissemination of its false and misleading advertising message, correct the false and misleading perception it has created in the minds of consumers, and obtain redress for those who have been economically harmed by purchasing the Products.

6.      Plaintiff bring this proposed consumer class action on behalf of herself and all other persons nationwide, who, from the applicable limitations period up to and including the present ("Class Period"), purchased any of the Products for consumption and not for resale.

7.        Defendant violated statutes enacted in each of the fifty states and the District of Columbia that are designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising. These statutes are:

1) Alabama Deceptive Trade Practices Act, Ala. Statues Ann. §§ 8-19-1, *et seq.;*
2) Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.;*
3) Arizona Consumer Fraud Act, Arizona Revised Statutes, §§ 44-1521, *et seq.;*
4) Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.;*
5) California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.,* and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.;*
6) Colorado Consumer Protection Act, Colo. Rev. Stat. § 6 - 1-101, *et seq.;*
7) Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.;*
8) Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.;*
9) District of Columbia Consumer Protection Procedures Act, D.C. Code § 28 3901, *et seq.;*
10) Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.;*
11) Georgia Fair Business Practices Act, § 10-1-390 *et seq.;*
12) Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480 1, *et seq.,* and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.;*
13) Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.;*
14) Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.;*
15) Indiana Deceptive Consumer Sales Act, Indiana Code Ann. §§ 24-5-0.5-0.1, *et seq.;*
16) Iowa Consumer Fraud Act, Iowa Code §§ 714.16, *et seq.;*
17) Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et seq.;*
18) Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.,* and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.;*
19) Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § § 51:1401, *et seq.;*
20) Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq,,* and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.,*
21) Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.;*
22) Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;
23) Michigan Consumer Protection Act, § § 445.901, *et seq.;*
24) Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et seq.;* and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.;*
25) Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-1, *et seq.;*
26) Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.;*
27) Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.;*
28) Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59 1601, *et seq.,* and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.;*
29) Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.;*
30) New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq. ;*
31) New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 *1, et seq.;*
32) New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57 12 *1, et seq.;*
33) New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.;*
34) North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et seq.;*

*35)* North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes §§ 75-1, *et seq.;*

*36)* Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. §§ 4165.01. *et seq.;*

*37)* Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.;*

*38)* Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, *et seq.;*

*39)* Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. Ann. § § 201-1, *et seq.;*

*40)* Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.;*

*41)* South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.;*

*42)* South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 *1, et seq.;*

*43)* Tennessee Trade Practices Act, Tennessee Code Annotated §§ 47-25-101, *et seq.;*

*44)* Texas Stat. Ann. §§ 17.41, *et seq., Texas Deceptive Trade Practices Act, et seq.;*

*45)* Utah Unfair Practices Act, Utah Code Ann. §§ 13-5-1, *et seq.;*

*46)* Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.;*

*47)* Virginia Consumer Protection Act, Virginia Code Ann. §§59.1-196, *et seq.;*

*48)* Washington Consumer Fraud Act, Wash. Rev, Code § 19.86.010, *et seq.;*

*49)* West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.;*

*50)* Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100. 18, *et seq.;*

*51)* Wyoming Consumer Protection Act, Wyoming Stat. Ann. §§40-12-101, *et seq.*

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). This is a putative class action whereby: (i) the proposed class consists of over 100 class members; (ii) at least some of the proposed class members have a different citizenship from Defendant; and (iii) the amount in controversy exceeds the sum of value of $5,000,000.00, exclusive of interest and costs.

9.      This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendant because its Products are advertised, marketed, distributed, and sold throughout New York State. Defendant engages in the wrongdoing alleged in this Complaint throughout the United States, including New York State. Defendant is authorized to do business in New York State; and Defendant has sufficient minimum contacts with New York and/or otherwise has intentionally availed themselves of the markets in New York State, rendering the exercise of jurisdiction by the Court permissible under

traditional notions of fair play and substantial justice. Moreover, Defendant's activity within New York is substantial and not isolated.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (b), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District and Defendant is subject to personal jurisdiction in this District. Plaintiffs purchased Defendant's Products in New York County.

## PARTIES

*Plaintiff*

11.      Plaintiff ASHLEI MCBRIDE is, and at all relevant times hereto has been, a citizen of the State of New York and a resident of New York County. On September 27, 2017, Plaintiff MCBRIDE purchased Defendant's 3.3 oz. Proganix Vitamin E + Ceramide 3 Repair Reparative Oil + Anti-Breakage from Target (Harlem, NY) after viewing Defendant's hair repair misrepresentations on the product label.  The purchase price was $12.96.

12.     Relying on Defendant's "repair" misrepresentation, Plaintiff MCBRIDE purchased the Product believing it would provide the advertised hair repair benefits listed in its product description and product title. However, the Product did not deliver these benefits after she used it as instructed by directions on the back of the packaging.  As a result of her purchase, Plaintiff suffered injury in fact and lost money. Had Plaintiff known the truth about Defendant's misrepresentations, she would not have purchased the Product, or would only have been willing to pay much less for it.  Should Plaintiff MCBRIDE encounter the Product in the future, she could not rely on the truthfulness of the packaging, absent corrective changes to it. However, Plaintiff MCBRIDE would be willing to purchase Defendant's products again if she is assured of the truthfulness of its representations.

*Defendant*

13.     Defendant VOGUE INTERNATIONAL LLC is a corporation organized under the laws of the state of New York, with an address for service of process at 405 Lexington Ave #26FL, New York, NY, 10174, and a principal address at 2600 McCormick Drive, Suite 320, Clearwater, FL 33759.

14.     Defendant develops, manufactures, distributes, markets, and sells hair care and other personal care products, including its Proganix 'Repair' product line, throughout the fifty states and the District of Columbia. The labeling, packaging and advertising for the Product, relied upon by Plaintiff, are prepared and/or approved by Defendant and its agents, and are disseminated by Defendant and its agents through advertising containing the misrepresentations alleged herein.

## FACTUAL ALLEGATIONS

### Defendant's "Repair" Claims Are False Because Hair Cannot Be Repaired

15.     While Defendant uniformly communicates to consumers that the Products can repair damaged hair, building this claim into the very name of its product line ("Repair"), the truth is that damaged hair cannot be repaired.   Hairmomentum.com, a website dedicated to providing science-based hair care information, explains why:

> Hair unlike skin does not have any cells to regenerate and repair.   Hair grows from **hair follicles** on the scalp.   These hair follicles behave like small organs, composed of tissues, blood cells, and glands among other essential components (see image).   Because these hair follicles are alive, they keep producing new hair, pushing out old hair through the shedding process (Telogen phase).   But hair on the other hand is mainly **Keratin, Protein** fibers. Once the fibers are broken, they cannot fix themselves, and there is no 'ointment' available like for skin to help them recover.[1]

> Many of these products have been specially formulated with polymers (many of them are protein based) such as hydrolyzed wheat protein, designed to fill the gaps in the hair temporarily. Imagine a cracked surface and putting in some putty just to fill those gaps.   The end result: a smooth surface, that feels repaired and that looks nicer than it was before.[2]

16.     The above is also the opinion of nationally respected hair care professionals. Citing Eugene Toye, senior stylist at Rita Hazan Salon in New York, WebMD notes that "[d]ry hair worsens with time because of accumulated abuse," and that the "only real way to get rid of the damage is to cut off damaged hair."[3]   Marc Debolt, Marie Robinson Salon colorist and Wella Professionals, explained to the Huffington post: "These masks act like a Band-Aid to smooth and mend frayed ends. The only true remedy for split ends is a haircut appointment."[4]   Joanna Vargas of Joanna Vargas Salons in New York and Los Angeles explains:

---

[1] http://hairmomentum.com/repair-breakage-and-split-ends-hair-truth-myth/ (last viewed 8/25/17)
[2] http://hairmomentum.com/repair-breakage-and-split-ends-hair-truth-myth/ (last viewed 8/25/17)
[3] http://www.webmd.com/beauty/features/dry-hair#2 (last viewed 8/25/17)
[4] http://www.huffingtonpost.com/2015/01/27/hair-mask-split-ends_n_6531902.html (last viewed 8/25/17)

One of the most common misconceptions about hair is that you can repair it, and bring back that shine and strength.

Hair treatments only appear to repair the damage as they coat the hair shaft, usually with a conditioning agent, making it smooth and shiny.

However, damaged hair cannot be repaired with any kind of hair mask or treatment but only create the appearance of restoration. The reason is that hair is dead once it is outside the hair follicle.[5]

17.     Unlike Defendant, some hair care product manufacturers readily acknowledge that their products cannot repair hair.  Manufacturer Renpure debunks the popular myth that this is possible:  "**Myth:** You can mend split ends with the right product. **Truth:** Once they are split, they are split. Products containing silicone or beeswax can be used to seal ends together, but it is a temporary fix. Keeping your hair properly moisturized will help prevent split ends but once you get them, cutting them off is the only way to get rid of them."[6]  Melissa Baker, spokesperson for Renee Furterer hair care products acknowledges that "[t]here is nothing you can really do to repair damaged hair -- it's all about masking the damage."[7]   And Josh Rosebrook of Josh Rosebrook Skin and Hair Care explains:

I know what you might be thinking- but there are so many products that promise to repair damaged hair! And yes, there are lots of conditioners, serums, and shampoos that promise permanent reversal for dry hair in need of restoration. It's marketing! Think about this- hair is technically dead and has no nervous system, blood, or cell regeneration. Because hair is not a living tissue with regenerative ability, it cannot heal. You can use oils, conditioners, or hydrolyzed proteins to disguise the issues temporarily but it's akin to using make-up, products improve the appearance but they will wash out and you are back to the original problem.

We need to become educated on the true science of hair and skin so we are not susceptible to and educated by marketing lies, twisted truths and false promises.[8]

---

[5] https://joannavargas.com/can-you-repair-damaged-hair/ (last viewed 8/25/17)

[6] https://www.renpure.com/fact-or-fiction-the-myths-and-truths-about-hair/ (last viewed 8/25/17)

[7] http://www.webmd.com/beauty/features/the-abcs-of-summer-hair-repair#4 (last viewed 8/25/17)

[8] https://joshrosebrook.com/blogs/news/91363463-you-cant-really-repair-or-heal-damaged-hair (last viewed 8/25/17)

18.     This consensus is also confirmed by individuals with scientific or medical credentials. *The Natural Haven*, a blog maintained by a Ph.D. in materials science, states that "[t]he only remedy for damaged hair is to cut off the damage and let the hair regrow."[9]  Dr. Zoe D. Draelos, M.D. explains: "One of the most common misconceptions about hair is that it is alive, when in fact hair is nonliving and does not heal itself once it is injured. So once the hair is damaged it cannot heal itself except through new hair growth at the scalp."[10]   Researcher J. Jachowicz summarizes the scientific research on the subject as follows:

> Efforts to restore the original properties of hair after mild degradation or to protect undamaged hair against structural weakening have been numerous but largely unsuccessful.[11]

19.     This scientific consensus aside, the simple fact is that if Defendant's repairing claims were true, the Product could only be lawfully marketed as an FDA-approved drug.  The FDCA defines cosmetics as articles "intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body or any part thereof for cleansing, beautifying, promoting attractiveness, or altering the appearance."   21 U.S.C. § 321(i).  The FDCA defines substances as "drugs" if they are "articles (other than food) intended to affect the structure or any function of the body of man …" 21 U.S.C. § 321(g).  Cosmetics that alter the structure of the skin are drugs even if they are also cosmetics:

> A product intended to be applied to the human body for cleansing, beautifying, promoting attractiveness, or altering the appearance is a cosmetic. If this product claims to accomplish these deeds through physiological activity or by changing the structure of the skin, it is also a drug.[12]

---

[9] http://www.thenaturalhavenbloom.com/2009/09/can-you-really-repair-damaged-hair.html (last viewed 8/25/17)

[10] http://www.webmd.com/beauty/news/20110207/expert-q-and-a-how-to-prevent-hair-damage#2 (last viewed 8/25/17)

[11] J. Jachowicz, *Hair damage and attempts to its repair*, J. Soc. Cosmet. Chem., 38, 263-286 (July/August 1987), pg. 283. (last viewed 8/25/17)

[12] Food and Drug Administration Cosmetic Labeling Guide, http://www.fda.gov/Cosmetics/LabeiingiRegulations/ucmI26444.htm#clga (Last accessed 8/14/17).

20.     Defendant's hair repair claims go well beyond the FDCA definition of a cosmetic and promises to "affect the structure or any function of the body of man," because this would be the only way to actually repair hair.  Thus, Defendant cannot argue that the Products can repair hair without also arguing that it is unlawfully marketing a drug as a non-drug cosmetic.

21.     Defendant suggests that the Products can repair damaged hair by virtue of the Vitamin E and Ceramide 3 inside it. The Products' back labels state:

> Repair: A high-performance blend of vitamin E combined with supercharged ceramide 3, perfected in the salon to infuse dry damaged hair with strength and elasticity while repairing split ends and frizziness adding healthy bounce and shine.

Defendant suggests that these two ingredients, Vitamin E and Ceramide 3, are what allow the products to repair hair. However, this is not true because neither of these ingredients have this ability. Even experts who believe that these ingredients often contain benefits do not argue that they can actually repair hair.

22.     West Parsons, a trusted hair and beauty expert in the blog and YouTube community, notes that Ceramide 3's purpose in hair care products is to "perform a 'barrier function' and help reduce the hair's overall porosity. Ceramide 3 binds to the hair fiber in damaged, vulnerable areas to help prevent natural moisture and protein loss that occurs when we manipulate our hair."[13] However, none of this is equivalent to repairing hair. Specifically the word "bind", according to the Merriam-Webster Dictionary, means to "make secure by tying", to "confine, constrain, or restrict as if with bonds", or to "wrap around with something so as to enclose or cover."[14] This definition fits the example of the Band-Aid imagery provided by hair care expert, Marc Debolt, in ¶ 14. Ceramide 3 may provide a protective layer on the surface of one's hair, nevertheless this is merely a temporary cosmetic alteration of its *appearance* and not

---

[13] http://confessionsofablogvixen.com/2011/05/how-ceramides-benefit-hair/
[14] https://www.merriam-webster.com/dictionary/repair

its chemical makeup. Thus Ceramide 3 is in no way capable of restoring damaged hair to its original state. This fact belies the Defendant's suggestion.

23.     HowStuffWorks, an award-winning educational website site that seeks to provide its target audience insight into the way many things work, makes a distinction between the natural occurring ceramides within hair and the synthetic ceramides found within hair care product. The article says of pseudo-ceramides: "Pseudo-ceramides are safe and nontoxic, and they work in a similar way to the ceramides your body produces…But while pseudo-ceramides are similar to the naturally occurring ceramides…they're not exactly the same. Just like natural ceramides, these synthetic lipids retain water in the upper layer of skin and repair dry, chapped skin by replacing lost lipids – but they don't disperse throughout the skin as natural ceramides do."[15] Though the article makes reference to "skin", as hair is comprised of keratin and dead skin cells, it would then be reasonable to assume that ceramide works on hair much in the same way it does for skin minus the ability to repair dead skin cells. If the pseudo-ceramide cannot imitate a natural ceramide, it would therefore mean that it cannot restore hair to an exact copy of its original state. Consequently, because these pseudo-ceramides are incapable of properly mimicking natural ceramides as "moisture retaining building blocks"[16], it would mean that its potency is only capable of accomplishing something that is weaker in effect than the reparative effect that Defendant suggests.

24.     Vitamin E is also incapable of "repair." Viviscal, a hair care and growth company whose products are supported by continuous research and development with some of the world's leading clinicians, says:

---

[15] http://health.howstuffworks.com/skin-care/problems/treating/pseudo-ceramides1.htm
[16] http://health.howstuffworks.com/skin-care/problems/treating/pseudo-ceramides1.htm

> [Hair care] research seems to indicate that vitamin E is really good for hair, but perhaps its role is somewhat overplayed. In fact, when we compiled our top 3 vitamins for thicker fuller hair, vitamin E didn't make the cut…Applying vitamin E alone to hair may give a lift, but is unlikely to result in a sustainable improvement.[17]

25.     According to Dr. Josh Axe, DNM, a certified doctor of natural medicine, Vitamin E may help to "decrease environmental damage to your hair" and make "your hair look healthier and fresher."[18]. But saying that Vitamin E can help decrease damage is not the same as saying that it can repair or restore hair to its original state. Thus, while Vitamin E may help to give the appearance of healthy hair, this benefit does not consist in any kind of "repair" that the Defendant had initially advertised for the Products.

26.     Defendant deceptively takes the limited evidence that Vitamin E and Ceramide 3 offer certain modest benefits to hair and without any scientific basis, blows this up into the claim that the Product can repair hair.

**<u>Defendant's Deception Misleads, Is Material To, And Is Relied Upon By, Reasonable Consumers</u>**

27.     Defendant's hair repair misrepresentation is material to a reasonable consumer because consumers of hair care products seek to remedy damaged hair, and therefore are attracted to any product that promises to repair it.  GNPD Mintel reports that nearly 30% of hair care products in 2014 made claims concerning damaged hair.  Launches of products claiming to treat damaged hair increased by 24% between 2010 and 2015, by contrast with only a 13% increase in hair care launches overall.[19]  Nielson reports that 25% of product offerings from the top 10 brands of

---

[17] http://www.viviscal.com/blog/is-vitamin-e-good-for-hair/
[18] https://draxe.com/vitamin-e-benefits/
[19] http://crodaincmktg.com/2015/F15_Eseminars/HairDamage/TheScienceBehindHairDamageRepair.pdf

shampoo and conditioner claim hair repair as a primary or secondary benefit.[20]

28.     Plaintiff relied on, and a reasonable consumer would rely on, Defendant's deceptive misrepresentation.  Consumer product companies intend for consumers to rely upon their representations. These representations are the only source of information consumers can use to make decisions concerning whether to buy and use such products. Consumers lack the ability to test or independently ascertain the efficacy and genuineness of product claims of normal everyday consumer products, especially at the point of sale. Reasonable customers must and do rely on the company to honestly report the nature of a product.

29.     A reasonable consumer is deceived by Defendant's "Repair" misrepresentation because the notion that hair can be repaired is already a widespread misconception. Accordingly, reasonable consumers are likely to believe a company claiming that its products can repair hair.

30.     This is confirmed by professionals who are intimately acquainted with ordinary consumer expectations regarding what hair care products can and cannot do. Salon owner Johanna Vargas observes above that "[o]ne of the most common misconceptions about hair is that you can repair it." ¶ 14.  Likewise, former stylist and hair products company founder Josh Rosebrook recognizes that most consumers do not know that hair cannot be repaired when he writes: "I know what you might be thinking- but there are so many products that promise to repair damaged hair!" ¶ 15.   And Dr. Zoe D. Draelos notes that "[o]ne of the most common misconceptions about hair is that it is alive." ¶ 16. Given that Defendant's hair repair misrepresentation reinforce a misconception that most people already have, there is every reason to believe that it is likely to deceive a reasonable consumer.

---

[20] http://crodaincmktg.com/2015/F15_Eseminars/HairDamage/TheScienceBehindHairDamageRepair.pdf (last viewed 8/25/17)

31.     Defendant might argue that a reasonable consumer does not interpret "Repair" as literally as does Plaintiff.  It might argue that the term is not intended to suggest that the Products will actually restore hair to its original undamaged state and is rather intended to advertise some lesser, more modest benefit, like strengthening hair, improving its appearance, or preventing future damage. This defense is implausible for several reasons.

32.     First, Plaintiff's understanding of "Repair" is fully in line with ordinary usage.  The Merriam-Webster Dictionary defines "repair" as "putting together what is torn or broken" or "to restore to a sound or healthy state."[21]  Defendant's "Repair" misrepresentation is deceptive by this definition, since the Products do not restore hair to the condition it was in prior to being damaged. Nor do the Products "put together what is torn or broken," because split-ends remain split even after the application of the Products.  One would not say that a piece of paper that was torn in two and then taped back together has been "repaired," and the Products deliver nothing more than this when it comes to hair.

33.     Second, Plaintiff's understanding of "Repair" is fully in line with the usage of hair care professionals.  *See* ¶¶  14, 15, 16.  These professionals would not be going out of their way to correct the misconception that hair can be repaired if most hair care product users understood "repair" as referring to some amorphous improvement in the look or feel of hair rather than the specific promise that hair will be restored to its original undamaged state.

---

[21] https://www.merriam-webster.com/dictionary/repair (last viewed 8/25/17)

34.     Third, Defendant itself undermines this defense when it claims that the Products will "infuse dry damaged hair with **strength** and elasticity while **repairing** split ends and frizziness adding healthy bounce and shine."  This claim is made on the labels of the Product. *See* **Exhibit B**. The claim that the Products can "heal" and "repair" split-ends and frizziness undercuts any suggestion that "repair" really means something like "strengthen", because the Defendant's inclusion of these promised benefits on its labeling would then be rendered redundant.  The statement therefore establishes that "repair" means something <u>stronger</u> than "strengthen".

35.     Defendant's promise that the Product is able to "repair split ends", as stated on the front label, is also deceptive. Its product suggests that it can "repair split ends" when in fact such a result is impossible as explained by Manufacturer Renpure in ¶ 15. A reasonable consumer, seeking to remedy damaged hair and under the reasonable assumption that the usage of the word repair is used in a literal sense by the Product, is influenced into purchasing it. Defendant promises that something substantial would result from usage of its Product however that promise is merely a part of its deception in seeking to make a profit from a reasonable consumer's assumption that split ends are capable of being repaired.

36.     The usage of the word "healing" is also an act of deception on Defendant's part. As defined by Merriam-Webster, "heal" means to "make sound or whole", to "restore to health", or to "restore to original purity or integrity". As already established in ¶ 13-15, hair cannot return to its original state. Furthermore, binding or patching up a damaged hair shaft is in no way similar or identical to the act of returning damaged hair to a state of health. However, the average consumer understands the usage of "healing" to mean something similar to the definitions mentioned above, but is deceived by Defendant's claim that "healing" means something other than restorative or

reparative. The reasonable consumer is thereby deceived in their reliance of the word "healing" on the front of Product.

**Plaintiff and the Class Were Injured As A Result of Defendant's Deceptive Conduct**

37.     Plaintiff and the Class suffered economic injury in that Plaintiff and Class Members did not receive the benefit of their bargain as purchasers of the Products, which are represented as capable of repairing hair but could not deliver the benefits advertised by Defendant.

38.     Defendant's choice of the Products' name—"Repair"—along with the increasing prevalence of repairing claims by hair products generally, *see* ¶ 15, establishes that a product that is capable of repairing hair has greater value than a product that is incapable of doing so.  This is also attested to by the statements of hair care professionals, which reveal the premium value that consumers attach to the ability to repair hair.  *See* ¶¶ 15, 16.  These professionals recognize that consumers see hair repair as a way to avoid haircut appointments they would prefer not to make.

39.     Given that the value of the Products as it actually functions is less than the value of the Products as warranted by Defendant, Plaintiff MCBRIDE and the Class have been injured in an amount equal to the difference between the two—either the entire purchase price or some other sum, to be determined by expert analysis at trial.

40.     *See Singleton v. Fifth Generation, Inc*., No. 15-CV-474, 2016 U.S. Dist. LEXIS 14000, at *10 (N.D.N.Y. Jan. 12, 2016) (finding that the plaintiff stated a claim under § 349 where he alleged that, had he "known 'the truth," he "would not have bought the vodka, or would have paid less for it."); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288-89 (S.D.N.Y. 2014) ("Plaintiffs claim that they paid price premiums specifically "based on Defendants' misrepresentations," and allege that they deserve damages in the amount of either the purchase

prices, or the price premiums, that they paid for Smart Balance. Id. ¶ 81. Accordingly, the Court finds that Plaintiffs have adequately alleged injury under GBL § 349, and thus also DENIES Defendants' motion to dismiss for that reason."); *Lazaroff v. Paraco Gas Corp.*, 967 N.Y.S.2d 867, 867 (Sup. Ct.). ("Additionally, the court finds that the plaintiff has adequately alleged an injury as a result of the defendants' conduct. Plaintiff alleges that, had he understood the true amount of the product, he would not have purchased it, and that he and the purported members of the class paid a higher price per gallon/pound of propane and failed to receive what was promised and/or the benefit of his bargain, i.e., a full 20 pound cylinder and the amount of propane he was promised…Thus, plaintiff has properly alleged injury. Accordingly, the court finds that the plaintiff has stated a claim for a violation of GBL § 349.")

41.     Additionally, Plaintiff MCBRIDE paid a price premium for the Product because Defendant's deceptive misrepresentation allows it to charge a higher price than it would if the claims of its representations were actually truthful.  This is confirmed by comparing the price of the Product with the prices of other hair oils available through Walmart.com and Target.com that do not make false and deceptive "Repair" representations:

| PRODUCT | PRICE | FL. OZ. | PRICE/FL. OZ. | LOCATION |
|---|---|---|---|---|
| Proganix Repair Reparative Oil | $12.96 | 3.3 | $3.93 | |
| Palmer's Moisturizing Hair Oil | $4.39 | 5.1 | $0.86 | Target |
| Garnier Fructis Triple Nutrition Marvelous Oil Hair Elixir | $4.94 | 5.0 | $0.99 | Walmart |

42.     *See Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489 (KMK), 2016 U.S. Dist. LEXIS 107097, at *51-52 (S.D.N.Y. Aug. 11, 2016) ("Plaintiff seeks monetary damages on the grounds that he 'would not have paid the premium price he paid' to buy the Products had he 'known the truth.' (Compl. ¶ 9.) Case law makes clear that this is sufficient at the motion-to-dismiss phase for a § 349 claim to survive."); *MCBRIDE v. It's Just Lunch, Int'l*, 2010 U.S. Dist. LEXIS 16622, 2010 WL 685009,  at *9 (S.D.N.Y. Feb. 23, 2010) ("[C]onsumers who buy a product that they would not have purchased, absent a manufacturer's deceptive commercial practices, have not suffered an injury cognizable under NYGBL § 349," but allegations that the plaintiff paid a price premium based upon deceptive practices are sufficient to state an injury).

**Defendant Knew That Its Misrepresentations Were False and Intended that Plaintiff and the Class Rely on Them**

43.     While much of the general public mistakenly believes that hair is alive and can be repaired, anyone involved in the hair care industry is familiar with what hair is and how it works. They therefore know that hair cannot be repaired.  Since Defendant understands this but nevertheless disseminates its "Repair" misrepresentation, this misrepresentation is knowing and intentional.

44.     Given that Defendant's "Repair" misrepresentation is built into the very name of the Product, Defendant intends that consumers rely upon it, as it would not otherwise be so centrally placed.

**CLASS ACTION ALLEGATIONS**

45.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff MCBRIDE brings this action against Defendant individually and on behalf of the following persons:

> All persons or entities in the United States who made retail purchases of the Products during the applicable limitations period,

and/or such subclasses as the Court may deem appropriate ("the Nationwide Class").

In the alternative, Plaintiff MCBRIDE seeks to represent

All persons who made retail purchases of the Products in New York during the applicable limitations period, and/or such subclasses as the Court may deem appropriate ("the New York Class").

46.     Plaintiff reserves the right to revise the Class definitions based on facts learned in the course of litigating this matter.

47.     **Numerosity**. While the exact number and identities of purchasers of the Products are unknown to Plaintiff at this time, Plaintiff is informed and believes that the Class contains thousands of purchasers who are so numerous that individual joinder of all Class members is impracticable.

48.     **Existence and Predominance of Common Questions of Law and Fact**. Questions of law and fact arise from Defendant's conduct described herein. Such questions are common to all Class members and predominate over any questions affecting only individual Class members.  The questions include:

a.   Whether Defendant's "Repair" representation is false and misleading and likely to deceive a reasonable consumer;

b.   Whether Defendant's marketing and advertising of the Products are false, fraudulent, deceptive, unlawful or misleading;

c.   Whether Defendant has breached warranties made to the consuming public about its Product;

d.  Whether Defendant's marketing, promotion, advertising and sale of the Products are and were a deceptive act or practice in the conduct of business directed at consumers, giving rise to consumer law violations in all relevant jurisdictions;

e.  Whether Plaintiff and members of the Class sustained monetary loss and the proper measure of loss;

f.  Whether equity calls for disgorgement of unjustly obtained or retained funds, restitution to, or other remedies for the benefit of the Class;

g.  Whether Plaintiffs and other members of the Class are entitled to other appropriate remedies, including corrective advertising and injunctive relief; and

h.  Whether Defendant's conduct rises to the level of reprehensibility under applicable law such that the imposition of punitive damages is necessary and appropriate to fulfill the societal interest in punishment and deterrence, and the amount of such damages and/or its ratio to the actual or potential harm to the Class.

49.    *Typicality*. Plaintiff's claims are typical of those of the Class members because, *inter alia*, Plaintiff and the other Class members are all injured by the same uniform conduct, as detailed herein, and are subject to Defendant's hair repair claims that accompany each and every Product that Defendant sells. Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class.

50.    *Adequacy of Representation*. Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained competent counsel experienced in prosecuting nationwide consumer class actions. Plaintiff understand the nature of her claims herein, has no disqualifying conditions, and will vigorously represent the interests of the Class. Neither Plaintiff

nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class.

51.     *Superiority*. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by any individual Class member is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant.  Thus, it would not be economically feasible for an individual class member to prosecute a separate action on an individual basis, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will prevent the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

52.     The prerequisites to maintaining a class action for equitable relief pursuant to Rule 23(b)(2) are also met, as Defendant acts or refuses to act on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

53.      Plaintiff seeks preliminary and permanent equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to prevent Defendant from engaging in the acts described, and requiring Defendant to provide full restitution to Plaintiff and Class members.

54.     Unless a Class is certified, Defendant will retain monies received as a result of its conduct that were taken from Plaintiff and Class members.

## CAUSES OF ACTION

### COUNT I

**INJUNCTION FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
(DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)**

**(brought on behalf of the Nationwide Class in conjunction with substantively similar
consumer protection laws of other states and the District of Columbia to the extent New
York law does not reach the claims of out-of-state Class members or, alternatively, on
behalf of the New York Class)**

55.     Plaintiff MCBRIDE realleges and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint and further alleges as follows:

56.     Plaintiff MCBRIDE brings this claim on behalf of herself and the other members

of the Class for an injunction for violations of New York's Deceptive Acts or Practices Law

("NY GBL § 349").

57.     NY GBL § 349 provides that "deceptive acts or practices in the conduct of any

business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

58.     To establish a claim under NY GBL § 349, it is not necessary to prove justifiable

reliance. ("To the extent that the Appellate Division order imposed a reliance requirement on

General Business Law [§] 349 … claims, it was error.  Justifiable reliance by the plaintiff is not

an element of the statutory claim." *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941

(N.Y. App. Div. 2012) (internal citations omitted)).

59.     Any person who has been injured by reason of any violation of the NY GBL §

349 may bring an action in their own name to enjoin the unlawful act or practice, an action to

recover their actual damages or fifty dollars, whichever is greater, or both such actions. The court

may, in its discretion, increase the award of damages to an amount not to exceed three times the

actual damages up to one thousand dollars, if the court finds the Defendants willfully or

knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

60.     The practices employed by Defendant, whereby Defendant labels and markets the Products as capable of repairing hair are unfair, deceptive, and misleading to Plaintiff and other Class members and in violation of NY GBL § 349.

61.     The foregoing deceptive acts and practices are directed at consumers.

62.     Defendant's actions impact the public interest because Plaintiff and members of the Class are injured in exactly the same way as thousands of others purchasing Defendant's Product.

63.     Plaintiff MCBRIDE and other Class members seek to enjoin such unlawful, deceptive acts and practices as described above. Each of the Class members will be irreparably harmed unless the unlawful, deceptive actions of Defendant are enjoined, because Defendant will continue to falsely and misleadingly promote the Products as capable of repairing hair.  Plaintiff MCBRIDE and Class members seek declaratory relief and injunctive relief in the form of an Order compelling Defendant to cease marketing the Products as being capable of "Repair."

**COUNT II**

**DAMAGES FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
(DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)**

**(brought on behalf of the Nationwide Class in conjunction with substantively similar
consumer protection laws of other states and the District of Columbia to the extent New
York law does not reach the claims of out-of-state Class members or, alternatively, on
behalf of the New York Class)**

64.     Plaintiff MCBRIDE realleges and incorporates by reference the allegations contained in all preceding paragraphs and further alleges as follows:

65.     Plaintiff MCBRIDE brings this claim individually and on behalf of the Class for violations of NY GBL § 349.

66.     Any person who has been injured by reason of any violation of NY GBL § 349 may bring an action in her own name to enjoin such unlawful act or practice, an action to recover her actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the Defendants willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

67.     By the acts and conduct alleged herein, Defendant commits unfair or deceptive acts and practices by promoting the Products as capable of repairing hair, thereby violating NY GBL § 248 and depriving Plaintiff MCBRIDE and the Class of the benefit of their bargain and charging a price premium.

68.     The foregoing deceptive acts and practices are directed at consumers.

69.     Under the circumstances, Defendant's conduct in employing these unfair and deceptive trade practices are malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

70.     Plaintiff MCBRIDE and the other Class members were injured in fact and lost money as a result of Defendant's deceptive and unfair trade practices.  In order for Plaintiff and Class members to be made whole, they need must receive either (1) the price premium they paid, (2) a refund of the purchase price, or (3) the difference between the purchase price and the actual value of the Products, to be determined by expert analysis at trial, as well as punitive damages, restitution and disgorgement of all monies obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs, and other relief allowable under NY GBL § 349.

**COUNT III**

**DAMAGES FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350
(FALSE ADVERTISING LAW)**

**(brought on behalf of the Nationwide Class in conjunction with substantively similar
consumer protection laws of other states and the District of Columbia to the extent New
York law does not reach the claims of out-of-state Class members or, alternatively, on
behalf of the New York Class)**

71.     Plaintiff MCBRIDE realleges and incorporates by reference the allegations

contained in all preceding paragraphs and further alleges as follows:

72.     Plaintiff MCBRIDE brings this claim individually, as well as on behalf of

members of the class, for violations of NY GBL § 350.

73.     Defendants have been and/or are engaged in the "conduct of … business, trade or

commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

74.     New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the

conduct of any business, trade or commerce." False advertising includes "advertising, including

labeling, of a commodity … if such advertising is misleading in a material respect," taking into

account "the extent to which the advertising fails to reveal facts material in light of …

representations [made] with respect to the commodity …" N.Y. Gen. Bus. Law § 350-a(1).

75.     Defendant caused to be made or disseminated throughout New York, through

advertising, marketing and other publications, statements that were untrue or misleading.

76.     Defendant's affirmative misrepresentations as alleged herein are material and

substantially uniform in content, presentation, and impact upon consumers at large. Consumers

were, and continue to be, exposed to Defendant's material misrepresentations.

27

77.     Defendant violates N.Y. Gen. Bus. Law § 350 because its "Repair" misrepresentation was material and likely to deceive a reasonable consumer.

78.     Plaintiff MCBRIDE and members of the Class have suffered an injury, including the loss of money or property, as a result of Defendant's false and misleading advertising. In purchasing the Products, Plaintiff and members of the Class relied on the misrepresentation that the Products repaired hair.  This misrepresentation is false and/or misleading because hair cannot be repaired.

79.     Plaintiff MCBRIDE and members of the Class have suffered an injury, including the loss of money or property, as a result of Defendant's false and misleading advertising.

80.     Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiff MCBRIDE and members of the Class seek monetary damages (including actual damages and minimum, punitive, or treble and/or statutory damages pursuant to GBL § 350-a (1)), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

## COUNT VI

## COMMON LAW FRAUD

**(brought on behalf of the Nationwide Class in conjunction with substantively similar consumer protection laws of other states and the District of Columbia to the extent New York law does not reach the claims of out-of-state Class members or, alternatively, on behalf of the New York Class)**

81.     Plaintiff MCBRIDE realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

82.     Defendant intentionally makes materially false and misleading representations regarding the Products' capabilities.

83.     Plaintiff and members of the Class reasonably relied on Defendant's false and misleading representations and did not know the truth that the Products cannot repair damaged hair.   Defendants knew and intended that Plaintiff and the Class would rely on its misrepresentations.

84.     Plaintiff and members of the Class have been injured as a result of Defendant's fraudulent conduct.

85.     Defendant is liable to Plaintiff and members of the Class for damages sustained as a result of its fraudulent conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, seek judgment against Defendant, as follows:

a.  An Order that this action be maintained as a class action and appointing Plaintiffs as representatives of the Nationwide Class and New York Subclass;

b.  An Order appointing the undersigned attorneys as class counsel in this action;

c.  Awarding restitution and disgorgement of all amounts obtained by Defendant as a result of its misconduct, together with interest thereon from the date of payment, to Plaintiffs and the proposed Class members;

d.  Awarding declaratory  relief as permitted by law or equity, including: directing Defendant to identify, with Court supervision, victims of its conduct and pay them all money they are required to pay;

e.  Statutory pre-judgment and post-judgment interest on any amounts;

f.  Awarding attorneys' fees and costs; and

g.  Such other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs, on behalf of

themselves and the Class, demand a trial by jury on all questions of fact raised by the Complaint.


Dated: October 4, 2017

<div style="margin-left: 40%;">

Respectfully submitted,

**LEE LITIGATION GROUP, PLLC**

By: */s/ C.K. Lee*_____
     C.K. Lee, Esq.


C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

</div>